FILED

MAR 12 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT**

In re:                                    )   BAP No. CC-17-1198-LKuF
                                          )
GARDENS REGIONAL HOSPITAL                 )   Bk. No. 2:16-bk-17463-ER
AND MEDICAL CENTER, INC.,                 )
                                          )
                    Debtor.               )
_____         )
                                          )
GARDENS REGIONAL HOSPITAL                 )
AND MEDICAL CENTER, INC.,                 )
                                          )
                    Appellant,            )
                                          )
v.                                        )   **M E M O R A N D U M***
                                          )
STATE OF CALIFORNIA, and its              )
Department of Health Care                 )
Services,                                 )
                                          )
                    Appellee.             )
_____         )

Argued and Submitted on January 25, 2018
at Pasadena, California

Filed - March 12, 2018

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Ernest M. Robles, Bankruptcy Judge, Presiding
_____

Appearances:    Samuel Maizel of Dentons US LLP argued for
                Appellant; Kenneth K. Wang, Deputy Attorney
                General for the State of California, argued for
                Appellee.
                _____

Before: LAFFERTY, KURTZ, and FARIS, Bankruptcy Judges.

---

*This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

The bankruptcy court ruled that the State of California Department of Healthcare Service's ("DHCS") postpetition withholding of Medi-Cal and supplemental hospital quality assurance ("HQA") payments from the Debtor to recover unpaid HQA fees constituted equitable recoupment of unpaid HQA fees and thus did not violate the automatic stay.

We AFFIRM.

**FACTS[1]**

Chapter 11[2] debtor Gardens Regional Hospital and Medical Center, Inc. formerly operated a hospital in Hawaiian Gardens, California. Debtor had a Medi-Cal Provider Agreement with DHCS and provided healthcare services to Medi-Cal beneficiaries.

**A.    The Medi-Cal Program**

Medi-Cal refers to the California Medical Assistance Program, through which federal Medicaid benefits are administered. Under the Medicaid program, the cost of providing healthcare to low-income people is shared between the state and federal government, with states administering the Medicaid program through their own specific plans. Medi-Cal is California's Medicaid plan, and DHCS administers it.

California is generally entitled to be reimbursed by the federal government for 50 percent of Medi-Cal costs. 42 U.S.C. § 1396b(a). To help cover its share of Medi-Cal costs,

---

[1]For this factual recitation, we borrow heavily from the bankruptcy court's published opinion, In re Gardens Regional Hospital and Medical Center, Inc., 569 B.R. 788 (Bankr. C.D. Cal. 2017).

[2]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

California enacted the Medi-Cal Hospital Reimbursement Improvement Act of 2013 (the "RIA"), codified at California Welfare and Institutions Code §§ 14169.50–14169.76. The RIA requires most general acute care hospitals to pay a quarterly Hospital Quality Assurance Fee ("HQA Fee"), which is assessed regardless of whether the hospital participates in the Medi-Cal program. Cal. Welf. & Inst. Code § 14169.52(a). The HQA Fee allows California to obtain more healthcare funds from the federal government, which generally matches state Medi-Cal contributions dollar for dollar.

The HQA Fee is calculated using a complex formula based primarily upon a hospital's "patient days." For example, "one Medi-Cal day" means that a hospital treated one patient under the Medi-Cal program for one day; "two Medi-Cal days" means either that a hospital treated two patients under the Medi-Cal program for one day each, or treated one patient under the Medi-Cal program for two days. The formula for calculating the HQA Fee takes into consideration a hospital's annual fee-for-service days, annual managed care days, and annual Medi-Cal days. Id. at § 14169.51(as).

After the HQA Fees are collected and augmented by federal matching funds, DHCS redistributes them to the hospitals through various types of quality assurance payments, including:

1) direct grants to public hospitals in support of health care expenditures, id. at § 14169.58(a)(1);

2) supplemental quality assurance payments to private hospitals, id. at § 14169.54-55;

-3-

3) increased capitation payments[3] to hospitals providing treatment pursuant to Medi-Cal managed health care plans, id. at § 14169.56; and

4) payments for children's health care, id. at § 14169.53(b)(1)(B).

The formulas under which the HQA Fees are assessed differ from the formulas under which the HQA Fees and associated federal matching funds are distributed. As a result, some hospitals receive more money on account of their HQA Fee payments than others. Therefore, in addition to allowing California to receive more federal matching funds, the RIA performs a redistributive function.

The RIA is only one component of a complex statutory scheme governing Medi-Cal's funding and administration. In addition to receiving various types of payments under the RIA, hospitals are also reimbursed for providing Medi-Cal services primarily through two systems: a fee-for-service system and a managed care system. In the fee-for-service system, DHCS enters into contracts with hospitals to provide services to Medi-Cal beneficiaries and makes direct payments to the hospitals. See generally id. at § 14132 et seq. (delineating the types of Medi-Cal benefits provided through the fee-for-service system). In the managed care system, DHCS contracts with managed care plans to provide healthcare services to Medi-Cal beneficiaries. See generally id. at § 14087.3 et seq. (setting forth standards governing contracts

---

[3]A capitation payment is a per-month, per-person reimbursement on account of treatment provided to patients enrolled in managed care plans.

-4-

between DHCS and managed care providers). The fee-for-service and managed care systems allow hospitals to receive a baseline reimbursement on account of the Medi-Cal services they provide. The RIA supplements that baseline reimbursement for hospitals that are eligible to receive payments under the Act.

**B.    Debtor's Relationship with DHCS**

Paragraph 2 of the provider agreement entered into between Debtor and DHCS in November 2014 requires, as a condition for participation as a provider in the Medi-Cal program, that Debtor comply with all applicable provisions of California Welfare and Institutions Code §§ 14000-14499.77. Among those provisions is the requirement to pay HQA Fees. Cal. Welf. & Inst. Code § 14169.52(a). Because Debtor provided healthcare to Medi-Cal beneficiaries on a fee-for-service basis, it was entitled to receive Medi-Cal fee-for-service payments ("Medi-Cal Payments"). Debtor was also entitled to receive supplemental quality assurance payments ("Supplemental HQA Payments"), calculated under formulas contained in the RIA, on account of certain services provided to Medi-Cal beneficiaries.

Debtor stopped paying quarterly HQA Fees in March of 2015; by the petition date of June 6, 2016, it owed $699,173.15 in HQA Fees. Postpetition, DCHS began withholding 20 percent of Medi-Cal payments owed to Debtor and an unspecified percentage of the Supplemental HQA payments owed to Debtor.[4] By July 18, 2016, DHCS had recovered the prepetition amount owing but continued the

---

[4]The record does not reflect how much of the withheld amounts represent Medi-Cal Payments and how much represents Supplemental HQA Payments.

withholding because Debtor failed to pay postpetition HQA Fees.

On May 2, 2017, Debtor filed a Motion for Order Granting Relief Against the State of California and Its Department of Health Care Services for Violating the Automatic Stay (the "Motion"). Debtor argued that DHCS's withholding of Medi-Cal and Supplemental HQA payments was an impermissible setoff that did not meet the standards for equitable recoupment and thus violated the automatic stay. Debtor requested that the court find DHCS in civil contempt and order it to pay Debtor $4,131,147.64 of withheld payments. DHCS opposed, arguing that its withholding of both types of payments satisfied the Ninth Circuit's "logical relationship test" for recoupment.

After hearing argument, the bankruptcy court issued written findings and conclusions, concluding that the doctrine of equitable recoupment allowed DHCS to withhold a percentage of the Medi-Cal and Supplemental HQA Payments it owed Debtor for the purpose of recovering unpaid HQA Fees. In re Gardens Reg. Hosp., 569 B.R. at 800. The bankruptcy court entered an order denying Debtor's motion to compel DHCS to turn over the withheld funds. Debtor timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(O). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Whether the bankruptcy court erred in concluding that DHCS's withholding of a percentage of Medi-Cal Payments and Supplemental HQA Payments owed to Debtor to recover unpaid HQA Fees was

permissible without relief from stay under the doctrine of equitable recoupment.

**STANDARD OF REVIEW**

We review de novo the bankruptcy court's application of undisputed facts to the law concerning equitable recoupment. <u>Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)</u>, 270 B.R. 749, 753 (9th Cir. BAP 2001) (citing <u>Sims v. U.S. Dept. of Health & Human Servs. (In re TLC Hosps., Inc.)</u>, 224 F.3d 1008, 1011 n.7 (9th Cir. 2000)).

**DISCUSSION**

**A.    Equitable Recoupment**

Equitable recoupment is similar to setoff.  Recoupment and setoff each permit a creditor to deduct amounts owed to it by a debtor from amounts it owes to the debtor.  Nevertheless, "they have differences with important consequences in the bankruptcy context."  <u>In re TLC Hosps., Inc.</u>, 224 F.3d at 1011.  Section 553 of the Bankruptcy Code preserves the right of a creditor to offset a prepetition debt it owes to the debtor against that creditor's prepetition claim.  Before exercising its right of setoff, the creditor must obtain relief from the automatic stay. See <u>Citizens Bank of Md. v. Strumpf</u>, 516 U.S. 16, 19 (1995); § 362(a)(7).  Section 553 does not permit setoff across the petition date; pre- and postpetition claims may not be offset.

Recoupment, on the other hand, is not mentioned in the Bankruptcy Code.  Rather, it is a common law equitable doctrine which has been defined as "the setting up of a demand arising from the **same transaction** as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of

-7-

such claim." Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392, 1399 (9th Cir. 1996) (citation omitted) (emphasis in original). Unlike setoff, recoupment is not subject to the automatic stay. In re TLC Hosps., Inc., 224 F.3d at 1011. Additionally, recoupment "is not limited to prepetition claims and thus may be employed to recover across the petition date." Id. (citation omitted).

In determining whether two events are part of the same transaction, courts in the Ninth Circuit apply the "logical relationship" test, analogous to the test used to determine compulsory counterclaims, i.e., where the counterclaim arises from the same aggregate set of operative facts as the initial claim. In re Madigan, 270 B.R. at 755; see also Newbery Corp., 95 F.3d at 1399 (noting that recoupment has been analogized to both compulsory counterclaims and affirmative defenses). In this context, the word "transaction" is given a "liberal and flexible construction." In re Madigan, 270 B.R. at 755 (citations omitted). A transaction may include "a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." In re TLC Hosps., Inc., 224 F.3d at 1012 (quoting Moore v. N.Y. Cotton Exch., 270 U.S. 593, 610 (1926)).

In the final analysis, the obligations must be "sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." In re Madigan, 270 B.R. at 755. As such, although not required, courts often find that the "same transaction" requirement is satisfied when corresponding liabilities arise

-8-

under a single contract. Id. at 758. "The rationale for allowing recoupment in contract cases is that it would be inequitable for the debtor to enjoy the benefits of a transaction without also meeting [its] obligations." Id. (citing Newbery Corp., 95 F.3d at 1403).

In any event, as we explain in detail below, application of the "logical relationship" test does not require that the obligations of the counterparties be identical, or, particularly in the context of a contract with a governmental entity intended to promote a public policy, that the class subject to an anterior obligation to the governmental agency be exactly the same class that would reap a benefit under the subject contract. Rather, a "logical relationship" may be found where there is an interconnection between the obligations such that it is equitable to treat them as the same transaction.

**B. The bankruptcy court did not err in concluding that DHCS was entitled, under the doctrine of recoupment, to withhold Supplemental HQA Payments owed to Debtor.**

A primary purpose of the RIA is to "improve funding for hospitals and obtain all available federal funds to make supplemental Medi-Cal payments to hospitals." Cal. Welf. & Inst. Code § 14169.50(a). The HQA Fees imposed under the RIA are to be "used to increase federal financial participation in order to make supplemental Medi-Cal payments to hospitals, and to help pay for health care coverage for low-income children." Id. at § 14169.50(d).

As noted by the bankruptcy court, the additional federal matching funds generated by the HQA Fees enable DHCS to have sufficient revenue to make Supplemental HQA Payments. Put

-9-

another way, without the HQA Fees, DHCS could not perform its redistributive function, and Debtor would not receive any Supplemental HQA Payments. Using a liberal and flexible construction of the word "transaction" thus leads to the conclusion that the HQA Fees are logically related to the Supplemental HQA Payments.

On appeal, Debtor contends that there is no logical relationship between its obligation to pay HQA Fees and DHCS's obligation to make Supplemental HQA Payments for three reasons. First, the formulas used to calculate each parties' liabilities are different; second, licensed acute care hospitals are required to pay HQA Fees even if they do not receive Supplemental HQA Payments, i.e., the obligation to pay the HQA Fees is based solely on licensure and not on any right to receive Supplemental HQA Payments; and third, the amounts of the HQA Fees to be paid bears no relationship to the amount of the Supplemental HQA Payments a provider receives.

Debtor has not cited any authority to support these arguments, and we agree with the bankruptcy court that Debtor's interpretation of the logical relationship test is too narrow. The facts that (i) the fees and the reimbursements are calculated using different formulas and (ii) the amounts paid and received are not related do not change the fact that without the HQA Fees, DCHS would have no resources with which to pay the Supplemental HQA Payments. And the fact that some hospitals are exempt from the requirement to pay HQA Fees but still receive Supplemental HQA Payments does not change the fundamental fact that the source of the funding for the Supplemental HQA Payments is, at least

-10-

indirectly, the revenue generated by the HQA Fees. Even conceding that the relationship between the Supplemental HQA Payments and the HQA Fees is not linear, the relationship is "sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." In re Madigan, 270 B.R. at 755. From this standard, it follows that a "logical relationship" may exist even when the transactions at issue do not correspond exactly.

**C. The bankruptcy court did not err in concluding that DHCS was entitled, under the doctrine of recoupment, to withhold Medi-Cal Payments owed to Debtor.**

As noted, the provider agreement between Debtor and DHCS requires, as a condition of being a Medi-Cal provider, that Debtor comply with all applicable provisions of California Welfare and Institutions Code §§ 14000-14499.77. Among those provisions is the requirement to pay HQA Fees; if fees are not timely paid, DCHS may immediately begin to deduct the unpaid assessment and interest from Medi-Cal Payments owed to the hospital. Cal. Welf. & Inst. Code § 14169.52(a) and (h). Accordingly, when it executed the provider agreement, Debtor agreed that DHCS could withhold unpaid HQA Fees from Medi-Cal Payments. Based on this agreement, we conclude that the logical relationship test is satisfied.

Despite this agreement, Debtor contends that no logical relationship exists between the HQA Fees and the Medi-Cal Payments for the same reasons Debtor disputes a logical relationship between HQA Fees and Supplemental HQA Payments: (i) DHCS's obligation to make Medi-Cal Payments arises from the fact that Debtor is a Medi-Cal participant, while Debtor's

-11-

obligation to pay HQA Fees is based solely on licensure; (ii) the respective amounts are calculated using different formulas; (iii) there is no express reference in the provider agreement to recoupment or offset or the HQA program; (iv) the bankruptcy court's analysis was too superficial because it lacked a detailed analysis of the obligations between the parties; and (v) the Medi-Cal provider agreement cannot create a logical relationship because it is a form document, citing Saint Joseph's Hospital v. Dep't of Public Welfare of Pennsylvania (In re Saint Joseph's Hospital), 103 B.R. 643, 656 (Bankr. E.D. Pa. 1989); Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of Social Services (In re Kings Terrace Nursing Home & Health Related Facility), No. 91 B 11478 (FGC), 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995), aff'd, 184 B.R. 200, (S.D.N.Y. 1995); and Hollander v. Brezenoff, 787 F.2d 834 (2d Cir. 1986).

We do not find these arguments persuasive. While true that Debtor would have to pay HQA Fees even if it did not participate in the Medi-Cal program, Debtor could not have become a Medi-Cal provider without agreeing that unpaid HQA Fees could be withheld from Medi-Cal Payments. And Debtor does not explain how the fact that the amounts are calculated using different formulas impacts its agreement to the withholding of Medi-Cal Payments to recover unpaid HQA Fees. Similarly, Debtor does not explain why incorporating statutory requirements into the terms of the provider agreement negated Debtor's consent to those terms or severs the logical relationship between the HQA Fees and the Medi-Cal Payments.

As for the bankruptcy court's analysis, we find no fault

-12-

with it. The court examined in detail the obligations of the parties. Although its analysis may not have matched the analysis done by the Ninth Circuit in TLC Hospitals, that case did not set out a bright-line standard or list of factors for analyzing recoupment scenarios. Ultimately, the analysis is an equitable one in which the court must determine, under the facts presented, whether the obligations at issue are "sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." In re Madigan, 270 B.R. at 755.

The argument that the Medi-Cal provider agreement could not be the basis for a logical relationship because it is a form document does not appear to have been made in the bankruptcy court; thus, we need not consider it. See O'Rourke v. Seaboard Surety Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir. 1989). In any event, none of the cases Debtor cites involve the application of the logical relationship test.

Debtor also urges the Panel to consider Indiana Family and Social Services Administration v. Saint Catherine Hospital of Indiana, LLC, (In re Saint Catherine Hospital of Indiana, LLC), 511 B.R. 117 (S.D. Ind. 2014), rev'd on other grounds, 800 F.3d 312 (7th Cir. 2015). The facts of that case are similar to those here, but with some important differences. The debtor in that case was an acute care hospital that treated Medicare and Medicaid patients. Like California, the State of Indiana had imposed a "hospital assessment fee" or "HAF" to facilitate increased reimbursement for hospital care to Medicaid patients. Prepetition, the Indiana Family and Social Services

-13-

Administration ("FSSA") withheld Medicaid payments to the debtor to recover unpaid HAFs and continued the withholding postpetition. On appeal from the bankruptcy court, the district court held that the withholding was not permissible as a recoupment because (i) the statute that authorized the HAF was separate from the regular pay-for-service arrangement; (ii) the obligation to pay the HAF was triggered solely by the hospital's status as an acute care facility; and (iii) the initial assessment was "frontloaded" in a way that rendered it akin to a tax. The court thus concluded that the obligations did not arise from the same contract or transaction. The case is distinguishable from our facts, however, in that there was no contract or statute that permitted FSSA to withhold Medicaid payments to the hospital to recover the HAF debt. Accordingly, Saint Catherine Hospital is not persuasive.

One final point. Throughout its argument, Debtor seems to contend that it would be unfair to permit one party to a contract unilaterally to dictate terms that essentially authorize equitable recoupment – such as, here, requiring (i) an acknowledgment of and an agreement to abide by obligations arising under statutes and regulations, and (ii) an agreement that violations of those statutes and regulations would lead not merely to a breach of the subject contract, but would also permit the governmental entity to exercise the contract remedy of recoupment. Were the provider contracts between private, independent, economic actors, we might find this argument worthy of consideration. Here, however, as a government entity, the State is guided by public policy considerations rather than

-14-

solely economic ones.  Indeed, it is abundantly clear from a review of the governmental programs that are the subject of this dispute that DHCS's purpose in entering into these agreements is not to create a profit center related to the provision of critical medical services, but to create and fund programs that will adequately serve the needs of its citizens, and will incent participants in these programs to provide the revenue that funds these necessary programs.  As such, we see nothing inequitable or unfair in holding Debtor to its obligations under the provider agreement and applicable state law.

**CONCLUSION**

The bankruptcy court did not err in ruling that DHCS's withholding of a percentage of Medi-Cal Payments and Supplemental HQA Payments owed to Debtor to recover unpaid HQA Fees was permissible under the doctrine of equitable recoupment and was thus not a violation of the automatic stay.

Accordingly, we AFFIRM.